We have four cases on the calendar this morning, three patent cases from District Courts and a vaccine case from the Court of Federal Claims, no patent office cases. Our first case is IBM v. Booking Holdings et al., 2018-15-74. Mr. Usayef? Good morning, Your Honors. Kareem Usayef for IBM. May it please the Court. Your Honor, in the Court below, IBM submitted substantial evidence indicating that defendants store content at the user's device. Defendants do this using cache control directives. Cache control directives are pieces of code that are sent down with web content that say what content to store and how to store it. The HTTP protocol specification saying how those requests be obeyed. And IBM's expert on this matter says that the other components, such as the browser or the operating system, are mere implementation details that slavishly implement. Am I right that the only theory that you proposed at the District Court was that this was direct infringement and you relied on SIRF, assuming that's how you pronounce it, but S-I-R-F, right? Your Honor, there were two theories of direct infringement. The first was under CERF and the second was under Akamai. We presented both of those issues, Your Honor. But both, so in other words, you're saying under Akamai, you're saying direct infringement because there's attribution. Exactly, Your Honor. But CERF is distinguishable, is it not? Because there, one entity controlled, it was vertical integration, controlled all aspects, right? I believe CERF is not distinguishable because you still have the cache control parameters that are actually sent to the user's device. And when they're executed, that's what dictates the storing process. So just like in CERF at the device, the remote device, there are things that are being executed. But it's the user who sets the process in motion, right? The user doesn't have any control over the storing process. They can either toggle a switch to say, I want to be able to have caching or not. And the default, by the way, is that caching will be honored and whatever the cache control directives say will be honored. The user can either, can disable that for all content, but they never have any control over any particular item whether that's stored. Just because the user can set and disable caching and prevent infringement from occurring, that's not the same as saying that the user has control. And in fact, their defendant's own expert says, quote, and this is Appendix 3392, there's no scenario where the user would have to take an affirmative action in order for information to be cached on their browser. Can you ask, clarify this for me. Is, putting aside storing for a minute, is there any step of the claims at issue that the user takes? That is, in particular, is the user's request for content among the claim elements here? Or does everything in the claims take place either after that or even before that in whatever structuring advertising might mean? So there's no claimed action that the user must take. The only claim elements are two structuring claims, structuring advertising, and then there's the storing claim. So the only claim element that defendants dispute is the storing claim. Everything else is indisputable that defendants do it. But the user, unless the user visits the website, nothing happens, right? Yes, that's correct, Your Honor. And that's the case in many accused products. So if we think about it, any computer software product, the user has to turn on their computer, they have to install it, they have to use it. And in many situations, the user has to take some kind of action first. But just like in SIRF, what SIRF says is once the GPS receiver is ready to process the data, only SIRF's actions are involved in processing or representing. Well, that's because SIRF was in control of all of the aspects, right? There was no independent user. In SIRF, someone actually had a GPS device on their phone. The SIRF product was a GPS chip, and it could be installed on mobile devices. So there, too, the user had to turn on the devices. In fact, SIRF says, and this is at 1323 to 1324, SIRF chips were incorporated into end-user consumer GPS devices. So it's in... But Priceline doesn't make the browser. That's correct. Or doesn't even... or doesn't sell the hardware. I mean, all of that was different in SIRF, right? So in SIRF, SIRF made the chip, but they didn't make the end-user consumer devices like the cell phone, et cetera. Those were third-party devices. This is no different than the variety of cases this court takes up where there's software, which is being accused, running on hardware that the defendant did not design. And whenever there's a receiving or sending step that is claimed by a patent, this court doesn't agonize over who made the networking card or the Ethernet cable. Whenever there's a displaying claim, this court doesn't agonize over who made the monitor or the LCD devices. That's because what's... the key issue here is who's dictating performance? Who is making sure that it occurs, making sure that it happens? And who's making the decision that everything else implements and obeys? And each of these method claims is performed each time there is a... basically an advertisement sent down, to use a shorthand. Exactly. And so that if the user, before the 43,000 times that happens, has done something to set a default or alter a default on the device, that precedes the steps in these methods. Exactly. So there's no situation where there's like an individual piece of content that comes down and the user has to say, like, save as, like in a Word document. Instead, the user can, in certain times, disable caching if they wish. And then afterwards, you know, there will be no infringement. But if they don't choose to do so, there's no user action that takes place when content is coming down. So it's just like in Z4, where there's an infringing mode of operation, which by the way, 95% of users are... it's the only way of operation that they're even aware of. And then just 1% actually decides to disable. But you're talking as if these browsers are people. I mean, the browsers do act to allow the storing, right? And to store. So if we're talking about the... So, I mean, in your view, is dictating the same as direction and control under Akamai? I don't understand where you're getting direct infringement outside of the Akamai landscape. The way we view a surf is that dictating is something where you control the process and something else might be involved in implementing that process. Actually, taking the ones and zeros and putting it on the hard drive, that process might be... need a browser to do it. But if you dictate it, in other words, if you say you need to do it and there's no control or decision-making process the browser can do to stop that, then that is dictating performance. On the other hand... So you're saying that we took the word dictating in surf and created a whole new legal principle of direct infringement outside of the Akamai context? Your Honor, we compare this to surf simply because there's a remote action that's happening far away from the computer. But setting aside surf, I think that it is uncontroverted that in direct infringement cases, in a situation where there's implementation details that happen one layer down, that's not what the court looks to. Otherwise, any accused infringer could look to a processor and say, we don't actually do what the software is... Our software might do X, Y, Z. But it's in fact the processor that has to move around the ones and zeros and the hardware that has to actually implement that and the hard drive that has to store things and the monitor that has to display things. Did you raise the Akamai issue with the district court? Yes, Your Honor. We raised the Akamai issue in the district court and that's at Appendix 31-17-18. And specifically, we had a whole section of our summary judgment opposition titled, there is substantial evidence that the actions that take place at the user's reception system are attributable to defendants under a theory of direct infringement. We cited Akamai at Appendix 3-1-1-7-18. And as soon as Travel Sentry came out, we filed a notice of supplemental authority telling the court that it was relevant to the summary judgment opinion that's at Appendix 5-0-8-5. You said it's relevant, but what theory then did you propose? If you're dictating, and CERC was pre-Akamai, of course, but if you're dictating language is not enough and you need some form of attribution within the bounds of Akamai, what form of attribution did you argue for? So below what we said is that this fits within the context of the particular facts. So if we look at Akamai, Travel Sentry, and Eli Lilly, they all refer to the fact that we need to consider the specific context and that the specific tests that are set forward in Akamai are not the only tests that are available. And that's the one that we set forward. Did you propose a particular test? I mean, we said in Akamai there are a variety of forms of attribution, and we were not closing out any of them necessarily, but you still had to have attribution. And then we expanded on that in Travel Sentry about the kinds of things you look at. So what did you ask the district court to look at here? We asked the district court to look at the fact that the components that are remote, that defendants say are third-party components, those are attributable because they must do whatever the cash control directives tell them to do. And this case is stronger than situations like Akamai, or Eli Lilly, or Travel Sentry, where it was an independent human user who could decide. Let me just interrupt you there. I mean, it seemed to me that your first argument really turns on that, that it is vitally important under 271 to distinguish persons from equipment. 271 asks who is doing things. Most of the discussion in this case is about the defendants are clearly doing things up at their server, sending stuff down. And then there's all this talk about what equipment is doing that happens to be owned or in the hands of somebody else, but not what that somebody else is doing. And I took it that your first point is that for the particular steps of these claims, the user isn't doing anything. Yes, exactly, Your Honor. In effect, defendants haven't come forward and talked about a third party. This is actually an Akamai case, because an Akamai case is when two different persons are doing two different things, and you're attributing person number two's action to person number one. Your first theory is there is no person number two for any of these steps. Yes, that's right, Your Honor. And to the extent the court decides that there is a third party, for example, whoever made the browser, whoever made the operating system or the user, that would be all attributable to defendants under Akamai. So your attribution theory is direction and control because of the instructions, the caching instructions? Yes, that's correct, Your Honor. So you're not talking about conferring a benefit? Yes, Your Honor, we are, in fact. But the benefit is to the operating system, not to the user, right? No, the benefit is definitely to the user, because the user doesn't have to wait around for content to be retrieved again if they already have it. Because the operating system can act more quickly? You're saying that that's not a benefit to the operating system? Well, that's a benefit to the user, because our expert testified, and this is at Appendix 3674, the average user is unlikely to want to disable caching because of the negative impact it affords. And that means that if you disable caching, you have a negative impact because you have to go back and forth and get that content again. And that's set forward in the HTTP protocol, which says the reason why you use caching in the first place is that you have the image available locally. Counselor, you wanted to say some time for rebuttal? Yes, Your Honor. We'll give you two minutes for rebuttal, and let's hear from the other side. Thank you, Your Honor. Mr. Franklin. Thank you, Your Honors. May it please the Court, Jonathan Franklin for the appellees. The District Court correctly held that the defendants did not infringe this patent because they do not perform, the defendants do not perform the step of storing the data at the local user system. What other person does? The equipment, the storing is done by the web, browsers. That's not a person. The user controls the web browser and also the manufacturer. Not once it's set. It's just sitting there doing whatever the remotely sent instructions are doing. The point is that we don't. We don't control it. It's always subject to the protocols in the browser and in the operating system. And those manufacturers, yes, they are people. There are humans involved in all of these. The human who makes that operating system can decide not to cache or cache. But once the user either lets a default caching stay or sets it for caching, all of which is outside any of these particular claim elements, the activities set forth in these particular steps will go forward while the user is asleep. Well, they're not outside the claims, Your Honor, because the claims require the storing. And if the user controls whether or not the storing is going to happen, then the user is in control of that step. And the user is in control of that step. We don't control it. In fact, my opposing counsel has made reference to the cache control headers. As we've said in our brief, we cannot ever dictate the caching of information that either the local systems or their users do not want to cache. And that's the key here. The key is who has control.  they still get full access to the operating system. Absolutely. The evidence is undisputed that our services operate in an identical manner regardless of whether caching is enabled or not enabled. This is a claim that was drafted... By the way, there was some discussion in the briefs about a possible difference between mobile devices that use apps. And I took it that there was some evidence, at least on IBM's side, that the user cannot disable caching in the mobile devices. There may be disputed evidence, but is that right? There's no evidence that I'm aware of in the record that says the users for the mobile apps can flip the switch as they can for the web browsers. But there still is no control by the defendants over the caching because what happens in these systems... That's where Chief Judge Stark in the reconsideration said the mobile operating system does all of the caching pursuant to its own protocols. We don't control those protocols. What the cache control headers do is they say if you're caching information, here's how long you should do it. But the important thing is he refers to the thing that says the headers must be followed. That is true. But the header says, for example, public information. Public information is the broadest category. That is something that is cacheable. All that the protocol says is it may be cached. So if you put in a public header, we put in a public header, it may be cached. It may be cached if the local system decides it wants to cache it. That's how this works. We don't control that process. I really wish you would keep talking about persons rather than systems. The system isn't deciding anything. Somebody tells it to do something at the moment of these steps. The people that wrote the software that the user is using at their system. There are humans that wrote the web browsers. There are humans that wrote the operating system. Their theory right now is anytime a software makes a call on some other system, and that system may have embedded in it some sort of an infringing method, that the party that made the call, made the program call on it, is a direct infringer. That would expand liability tremendously. I think this is really quite an easy case. Could the mobile browsers be the direct infringers in this context? Because the mobile browsers call on the operating system. Yes, they are the direct infringers. The mobile browsers in this case don't call on the operating system. They do the caching themselves. There is no mobile browser that is involved in these apps. It's an operating system that uses that functionality. Have you thought about how, I realize, about Centillion. Centillion is not a method case. It's about a system case. It's all about using a system in which different components are actually spread out. Some at your home, some at Quest servers in Denver or something. And there I thought, we said the person who sets the thing in motion, which in that case was going to be the home user, was actually directly infringing by using the system, even though parts of that system were absolutely under the control of Quest. I apologize, I don't think I'm familiar with that case, but each patent is different. And a lot of these issues, frankly, can be dealt with by patent drafting. In this case, they drafted a patent that required storing at the local user's device. We don't do that. Other systems and humans do that. Do you see a distinction between Claim 1 and Claim 8? I know they didn't argue a distinction, but is the structuring language doing anything in Claim 8? The structuring language isn't really... It's the storing issue that we're dealing with. Is there a difference between saying, here's the steps of the method, and our method is structuring a system so that you could get to a storing capability? Yeah, but that's not what it says. It says structuring, advertising, and storing. So storing is an element of Claim 8 as well. Doesn't it say structuring advertising includes storing? Structuring advertising so that it may be selectively strived wherein structuring advertising includes supplying and storing. Wherein structuring advertising includes supplying and storing. Doesn't that mean the structurer, which has to be you, is doing the storing? Yes, and we're not. So you're not even doing the structuring? We're not doing the structuring that is described in this claim. We're not. Because the structuring includes storing, we're not doing the storing. Another party is doing the storing. He's doing the structuring. In this case, again, nobody, because structuring advertising includes two things, and so we're not doing the second of those two things. So nobody is doing...  I guess I took it that the structuring of advertising is definitely something that the publisher who's running the server is doing. They're making it so that it fits nicely with the non-advertising content and it arrives at the same time or is there at the same time, and that the language here by saying structuring advertising includes storing implies that the structurer is the storer. Why does that not imply that? To be an infringer, yes. So they've defined what structuring advertising means here. You have to do two things to be a structurer of advertising. You need to do step one and step two. We don't do step two. We're not a structurer under this claim. We don't infringe this claim. This is, I think, Judge O'Malley, CERF is clearly distinguishable. That was a case where the sole defendant controlled, not just controlled, but made the hardware, wrote the software, installed it at the user system, and I would add, by the way, that court and CERF made clear and emphasized that the users had no ability to change what the defendant did, its infringing systems. Here it's completely different. We don't control the web browsers and the operating systems and the users who ultimately control both. We don't control them. This is an easy case for the following reason. There's no direct infringement under CERF because there is, in fact, a step, the storing step, that we don't do. There's no attributed... Under ACAMI, you can attribute infringement, you can have vicarious liability in four different ways. You can have a contractual relationship, you can have an agency relationship, you can have a joint enterprise, or you can have conditioning of a benefit or participation on the step. They haven't made any argument under one, two, or three, and number four clearly waived in the district court, and I want to just clarify that if I could. We said in our summary judgment motion, you aren't making any argument under that prong of ACAMI 5 that there's a conditioning of a benefit. And they weren't. Not only that, we said your expert, he testified that you conditioned a benefit on this step, the screen displaying step, but not the caching step. They responded, we don't need to prove that because we can do it a different way. So it's not just a case where they never made the argument below. They affirmatively said, we aren't making the argument below. And then when Travel Sentry came out, we had cited the district court opinion in Travel Sentry, and they said, oh, that's been reversed. They never made an argument that there was a conditioning of a benefit. And the reason I think they never made that argument is there is no conditioning of a benefit here. Our websites operate, as the testimony says, in identical manner, regardless of whether caching is enabled or caching is not enabled. We don't care. And if this was an argument that they wanted to make... Do you remember the IBM patented issue says what are the supposed problems being solved here by this, and here I'm just going to use the term prefetching. So let me just put it in context. We're dealing in, this is old enough to remember what that is. Well, this is extraordinary that this patent is still alive in the 1989. That's another issue. But this was a closed system involving typically and almost exclusively dial-up modems where it could take... Right, I guess that actually maybe I'll just flip ahead. It seems to me you may not be providing a benefit through this because now we have super fast unlimited bandwidth, but that doesn't mean that had you been using the older form where it mattered to have some of the to-be-displayed advertising not having to come through on the same wire that would have been a benefit. We don't do the prefetching, and that's our alternative argument because we just... Only the caching that's done by the operating systems and the browsers is done when the thing is retrieved in response to a call. But just to make that point, what I was going to say is if they wanted to make this argument, the conditioning of a benefit argument, which they clearly below, said they weren't making, we would have come back with extensive evidence showing, for example, to the extent there's any difference in speed, it's milliseconds. Milliseconds. No user considers that to be in any way material to their use of our websites. Very impatient people. I don't think they're that... You don't refuse access to your material. And this is just the MedGraph case, in our view. The MedGraph case said there was an automatic synchronizing step. By the way, it was automatic, so it was a system that was doing it. There was an automatic synchronizing step that the party... that didn't have to be done, and what the court said is, well, the users can take their data into their doctor and have the doctor extract it, or they can print it out and take it in. Obviously, those are things that are less efficient, but the court said there was no conditioning of a benefit. And my point here is that there are many, many facts that we would have put into evidence. Among them, also that there's very, very little of what IBM would consider to be advertising data that we ever allowed to be cached by the operating systems of the browsers, because, among other things, we get paid for how many ads we sell, because the ads need to be current, and most often, almost exclusively, the ads are just links to websites from the advertiser. They're not data that can be cached on the local system. All of these things we would have shown... Your metering of the advertising is from the transmission, not from the display. That's what I understand, Your Honor. We would have put a lot more... My only point here, this is going to the waiver point. I mean, this is... I've rarely seen a clearer example of waiver here. This is something that they never argued. We told them it wasn't in the case. We told them their expert never testified about it. They came back and said, yeah, we don't need to do that, because we've got other theories, and then for the first time on appeal, they bring out this test, which I think, Your Honors, are familiar with Travel Sentry. That was litigated extensively below. Manky's is another case where this court said it wouldn't be doing this on appeal for the first time, and of course, remanded, but in that case, the law had changed while it was on appeal, so the party had that opportunity. Here, the law was established well before. This is not a direct infringement case. It is not an attributed infringement case under Akamai, because, as I said, they haven't made any arguments under the first three parts of that test, and the fourth part, they've clearly waived. I think this is something that fits quite squarely into the court's precedence, and for the court to then adopt this view that any time somebody sends instructions to another entity's operating systems or web browsers, that then in their view, cause this to happen. Now, we don't think that actually happens, but causing something is not the same as being a but-for cause is not the same as having the kind of control that you need, and I think that what the court has said in divided infringement cases is we need to put a lid on this because it would blow away the entire doctrines of induced and contributory infringement. So we would ask the court affirm the judgment below on these grounds or on the alternative grounds that we've also presented in our brief. Thank you, counsel. Mr. Lucieff has some rebuttal time, two minutes. Your Honor, defendants all but concede the direction or control point on their appeal group. What they say there is they characterize IBM's substantial evidence as showing that they merely control or they just cause or they necessarily require storing to occur. That's how they characterize IBM's evidence. And that evidence must be viewed in light most favorable to IBM. So at the point in which they say that, that means that to the extent there even is a third person in which they haven't identified, that behavior should be attributed to defendants. And that's why it makes sense to find attribution if the court does not find direct infringement. Can you address the kind of broad point that Mr. Franklin mentioned that to adopt your primary theory of causing the storing because the user can be asleep when it's has control of the equipment in a general sense would vastly expand infringement liability in both unprecedented and dangerous ways? Your Honor, it would not expand liability in the way that defendants posit. And the reason why is you'd still be asking who in effect is deciding what is occurring. So if there was actually evidence that the users have to look at a pop-up box, and then they say, well, I'm choosing to download this. Please download. Then we'd be in a different situation. If there was a situation in which the operating system, there's evidence that rather than just blindly obeying whatever happens, actually has to make a decision-making process, then maybe we'd be in a different situation. So that's the backstop to overly expansive infringement. The question is, who's driving the bus in this scenario? Not who's manufacturing the wheels or some implementation details on the lower end. And that's really the issue here. In effect, defendants are confusing... When you say who's driving the bus, there have to be circumstances, either for conditioning of a benefit or otherwise. In Eli Lilly, we said, okay, those patients have no choice. They have to do these things in order to get the medical treatment. This is not a situation in which the downstream servers have no choice, right? Your Honor, the evidence is that they have no choice. The HTTP protocol says the directives, quote, must be obeyed. In comparing it to Eli Lilly, if we think about Eli Lilly, that was about a case where a pharmaceutical company set out particular instructions for how to do treatment. And then the expert witness in that case said that physicians, based on that evidence, would then withhold folic acid or withhold treatment unless the patients used folic acid. So the two steps removed from what the defendant was doing. First, physicians would act in this way, and then patients would be denied a benefit if physicians happened to withhold treatment based on them taking folic acid. Evidence is clear that there's no benefit that's withheld. Anybody can still access that website whether they cash or not. The question, though, Your Honor, is not whether they can access the website but whether the activity is conditioned. And the activity here is storing. The activity is not visiting Priceline's website. So the key question we have to ask is is the benefit from storing... That's an awfully narrow assessment of what the benefit is if you didn't waive this argument. In Appendix 3533, that's the HTTP protocol, and it says why you store. And you store to increase speed, and that's a benefit to the user. As to waiver, we actually had a section in our brief about attribution, and furthermore, if we think about defendants' weight... But did you argue the benefit from conditioning a benefit from? You didn't, though. Because that was already before the court. The court decided that there was a benefit at Appendix 5451-52 where it talks about the benefits of the invention. Rather than talking about the benefits of the invention over again, we pointed to the other factual scenarios that might give rise to liability. Counsel, as you can see, you've exceeded your time. We'll conclude the argument. The case is submitted. Thank you, Your Honor.